2021 IL App (1st) 181225-U
No. 1-18-1225
March 29,2021

FIRST DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1)

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11 CR 2222 |
| | ) | |
| BRAYANT ROGERS | ) | The Honorable |
| | ) | Joseph Joyce |
| Petitioner-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*: Petitioner's post-conviction petition was properly dismissed following first-stage review where petitioner failed to sufficiently allege actual innocence based on newly discovered evidence or that his appellate counsel was ineffective.

¶ 2     Petitioner Brayant Rogers was charged by indictment with multiple counts of first-degree murder, attempt first-degree murder, aggravated battery of a firearm, aggravated discharge of a firearm, and unlawful use or possession of a weapon by a felon. Following a jury trial, Rogers was convicted of first-degree murder, aggravated battery with a firearm, and aggravated

discharge of a firearm, and sentenced to 53 years' imprisonment. Rogers filed a *pro se* post-conviction petition alleging actual innocence based on newly discovered evidence and ineffective assistance of appellate counsel, which the trial court summarily dismissed. Rogers now appeals that dismissal. For the following reasons, we affirm.

¶ 3                                BACKGROUND

¶ 4       On January 4, 2011, Brian Green sat in the driver's seat of a van eating a sandwich he had just purchased from Subway. Kabreisha Hall, David Thompson, and Kenny Wilson were also inside the van. Rogers, believing Green made a threatening gesture, fired multiple shots at the driver's side of the van. Green was shot in the back and died from the gunshot wound. Wilson was shot in the finger.

¶ 5       At the hearing on Rogers' motion to quash arrest and suppress evidence, Chicago Police Officer Thomas Hope testified that he saw a man with a gun approach a van parked in a parking lot, and then heard gunshots from the driver's side of the van. Officer Hope followed the man and later recognized him to be Rogers. The trial court denied Rogers's motion.

¶ 6       Rogers then filed his answer to discovery, indicating that he sought to admit evidence from three recent shootings in the same area to show his state of mind for self-defense. **The evidence was not *Lynch* material. The State objected, arguing that the previous shootings were irrelevant to the issues in the present case**. Neither Rogers nor any of the four victims had any involvement or connection to these prior shootings. The trial court ruled that evidence of the three shootings was inadmissible.

¶ 7       Defense counsel then argued that the shootings were gang shootings of Black P Stone gang members by Vice Lord gang members. Rogers was a member of the Black P Stone gang and

2

believed that Wilson was a member of the Vice Lord gang. The trial court excluded evidence of gang membership.

¶ 8    The trial court denied both of Rogers' motions to reconsider. Regarding the three previous shootings, the court clarified that the defense could not present evidence related to these shootings because of the danger of jury confusion. However, Rogers would be permitted to testify about his knowledge of the shootings and how it may have affected his state of mind. Regarding gang membership, the court did not find evidence that the shooting was gang related and would not permit speculation. Further, the court concluded that evidence of gang membership was not relevant, reasoning that membership alone was not unlawful and seeing someone in a van who may be a member rival gang does not "put [one's] life in danger" or give "someone the right to shoot back at them." Finally, the court stated that any probative value of gang membership is outweighed by its prejudicial effect.

¶ 9    At trial, Josie Shivers testified that she lived in the Uptown neighborhood of Chicago. Roosevelt McDaniel testified that he lived in the garden apartment at 4520 North Malden. On January 4, 2011, McDaniel and Shivers were inside McDaniel's apartment. Around 11 a.m., Rogers entered the apartment to retrieve a .38 revolver he had stored there. After Rogers collected the revolver, he left the apartment and McDaniel and Shivers went back to sleep.

¶ 10    Rogers later returned to McDaniel's apartment. Both Shivers and McDaniel testified that Rogers was sitting on the floor, hyperventilating and unable to catch his breath. Rogers was wearing jeans and a black hoodie. Rogers tried to give the gun to Shivers but she did not want it. McDaniel took the gun and placed it on the floor. McDaniel and Shivers then heard police knocking on the front door. Rogers ran out of the back door leaving behind his black hoodie.

McDaniel picked up the revolver and put it in a laundry bag. McDaniel identified Rogers in a line-up later that day.

¶ 11     Hayward Hudson testified that on January 4, 2011, he drove with Green, Wilson and Thompson, and Hall to take his son to school in his blue, full-size, Chevy van. After dropping off his son, the group went to the Subway restaurant near the intersection of Wilson and Magnolia Avenue. They parked in the parking lot, then Hudson and Green went inside. Hudson denied interacting with anyone outside. Green got his food first and left. As Hudson walked back to the van, he saw a man wearing a black hoodie holding a gun approach the van. When the man began firing the gun, Hudson ducked by the side of the van. When the shooting stopped, Hudson jumped in the van through the back, jumped over to the driver's seat, and drove off. **Hudson drove up Magnolia Avenue** until he saw the police and let the police car know what happened. Everyone got out of the van except Green.

¶ 12     Thompson testified that he was sitting behind Green in the van, with Wilson next to him, Hall in the front passenger seat, and Hudson behind. After being inside Subway for about 5-6 minutes, Green returned to the van, sat in the driver's seat, and shared his food with Wilson. Green then noticed a man with a gun. Thompson looked out the window and saw a man approaching the van from about ten feet away, wearing all black, pointing a gun at the van. Thompson ducked, and the man began firing into the driver's side of the van. He explained that the van's windows were up, so the shots caused bullet holes on the driver's side of the van and blew out the front passenger window. Green ended up in the back of the van and had been shot. After the shooting, Thompson viewed a line-up and identified Rogers as the shooter.

Thompson testified that no one in the van engaged Rogers in any way, nor did anyone in the van have a gun or shoot a gun.

¶ 13    Hall testified that she, Thompson, and Wilson waited inside the van with the windows up while Green and Hudson were inside Subway. They did not interact with anyone outside the van during that time. When Green returned to the van, he looked out his side mirror and noticed a man with a gun. Hall then heard several shots being fired into the van. When the shooting stopped, Hudson got in the van and drove off. A few blocks down, Hudson flagged down the police and told them someone was shot in the van. They all got out of the van to wait for the ambulance. Hall denied flashing any gang signs or seeing anyone in the van flash gang signs. She also denied having a gun or seeing anyone in the van with a gun that day.

¶ 14    Wilson testified that when Green returned to the van, he and Green were looking out the window discussing a camera above the plaza when they saw a man walking to the driver's side of the van wearing all black with a revolver in his hands. As the man began firing, Green tried to move to the back of the van. Wilson got hit in his left index finger. After two more shots, Hudson entered the van, got in the driver's seat, and drove off. Hudson had driven the wrong way down a one-way street and a police car pulled the van over. An ambulance was called, but Green died in the van. The paramedics wrapped Wilson's finger, but he refused additional medical attention. Wilson was upset when he went to the police station and viewed a line-up. He saw Rogers in the line-up but did not identify him because he was "frustrated" and his "mind was clouded."

¶ 15    Iqbal Ahmed testified that he owned the Subway restaurant at the corner of Wilson and Magnolia and was working there on January 4, 2011. He testified that the area was dangerous,

and he was aware of other shootings. A little past noon, two individuals came in and ordered sandwiches. One of the men left before the other. Ahmed did not hear anyone yelling outside but heard gunshots when he was in the back of the store. He walked to the front and saw a blue van pull away. He also saw a person with a gray or black hoodie walking "very briskly" on the sidewalk heading westbound on Wilson Avenue. Ahmed testified that the Subway's video system captured the incident. Ahmed narrated the video: a blue van pulled up to the entrance door at 12:13 p.m.; at 12:13:50 p.m., two individuals enter the store; at 12:17 p.m., an individual comes into view; at 12:18:25 p.m., the first individual leaves the store, followed by the second at 12:19:26 p.m., who then ducks down; the van pulled off.

¶ 16    Officer Hope testified that on January 4, 2011, he was conducting narcotics surveillance at the intersection of Wilson and Magnolia. At approximately 12:15 p.m., he observed a man, 40-50 feet kitty-corner from him, in the Subway parking lot "remove what appeared to be a black handgun" and then run toward the driver's side of a blue van. Officer Hope lost sight of the man, explaining that the van's positioning blocked his view. He was not able to see whether there was movement in the van because of its tinted windows and denied hearing shouting. Officer Hope then heard five to six gunshots and observed glass blow out of the passenger side of the van. Officer Hope saw the man run away around the rear of the van, holding the handgun, and continue to run westbound on the sidewalk of Wilson Avenue. Officer Hope pursued the man in his vehicle.

¶ 17    The man ran westbound on Magnolia, then southbound on Malden Street. At that point, Officer Hope did not recognize the man to be Rogers. Officer Hope jumped out of the car and pursued the man on foot. Officer Hope observed the man enter the garden apartment at 4520

6

North Malden. Officer Hope, along with four other officers, went to the apartment, pounded on the door, and announced themselves as police. A male resident opened the door and let the officers inside the apartment. Officer Hope testified that the man said, "dude went out the back" and that the "gun is over there" and motioned to the rear door. Officer Hope followed the doors outside into the gangway, which led to an alley. When he got to the gangway, Officer Hope saw two officers placing the man in custody. At that time, Officer Hope recognized the man as Rogers. Rogers was not wearing a hoodie when he was arrested. Officer Hope went back inside the apartment and saw the black hoodie and the handgun.

¶ 18      Rogers testified in his own defense. He testified that he was from the Uptown neighborhood and a member of the Black P Stones gang. He described five shootings in the area during the six months before this shooting and was aware of at least 10 more shootings, most of which were gang related. One of the shootings occurred on July 29, 2010, when Rogers was shot at Wilson and Magnolia. His friend was also shot and killed in that incident. Rogers testified that between the summer of 2010 and January 4, 2011, he was shot at approximately five times, not including July 29, 2010 shooting. Rogers carried the .38 revolver recovered in this case for protection.

¶ 19      Rogers testified that he sold drugs out of McDaniel's apartment. On January 4, 2011, he went to McDaniel's apartment to collect the money from drug sales. At approximately 12:15, Rogers left the apartment with his gun in his waistband to make a drug sale in the parking lot of the Subway. After making the drug sale, he got a phone call from his cousin. Rogers then decided to get something to eat at the Subway. Rogers claimed as he was walking towards the restaurant, an individual, whom he later found out to be Hudson, walked outside of the

restaurant and yelled out, "there go one of the Mo's right there." Rogers explained that "Mo's" was a term used to describe the Black P Stones gang. Rogers testified that Hudson resembled the person who had shot him. Although Rogers did not see a gun in Hudson's hands, he believed Hudson was going to shoot and he feared being shot again. Rogers went to the side of the van to take cover. He did not know that Hudson had gotten out of the van or had any connection to the van.

¶ 20    Rogers did not know the person in the driver's seat and had never seen him before. Rogers testified that the driver appeared to be reaching down or pointing, and then stood up and the driver's door came open. Rogers did not know what was in the driver's hands and did not see a gun. Nonetheless, he believed the driver was going to start shooting. According to Rogers, he did not try to shoot the driver, instead he only meant to shoot at the back of the van to prevent the driver from shooting him. Since the windows were tinted, Rogers could not see if anyone else was in the van.

¶ 21    After he shot at the van, Rogers ran to McDaniel's apartment. When he got there, he pulled his hoodie off and sat on the floor, trying to catch his breath. After he heard the police at the door, he jumped up and ran out the back door. He claimed that he ran because he did not want to get arrested, not because he was afraid of what had happened.

¶ 22    The defense rested. The State entered certified copies of Rogers's prior convictions in rebuttal and then rested in rebuttal. Rogers was found guilty of first-degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm. Rogers' motion for a new trial was denied. Following a sentencing hearing, the trial court sentenced Rogers to 53 years'

imprisonment: 47 years for the first-degree murder and 6 years for the aggravated battery with a firearm with the sentences to run consecutively.

¶ 23        Rogers appealed, arguing that the trial court erroneously allowed the State to impeach Rogers with evidence of his prior convictions, including a conviction for attempted first degree murder. The appellate court affirmed. Rogers' petition for leave to appeal was denied.

¶ 24        On December 4, 2017, Rogers filed a *pro se* post-conviction petition. He alleged actual innocence based on the newly discovered evidence that shortly after the shooting someone threw a gun out of the blue van. In an attached affidavit, Rogers swore that Kelsky Patterson told him that he was in the vicinity on January 4, 2011, and he removed a gun he "observed a man throw from a van." Rogers attested that he did not learn about Patterson's involvement in his crime until 2017.

¶ 25        Rogers also attached an affidavit from Patterson. Patterson attested that he was a Black Stone gang member from the area of Wilson and Magnolia. On January 4, 2011, he was at a friend's house at 4513 N. Magnolia when he heard 5-6 gunshots fired on Wilson, between Malden and Magnolia. About a minute later, he saw a blue van "flying down" Magnolia and stop "directly across the street" from him at 4510 N. Magnolia. The driver's door opened, and a small gun was tossed under a parked car. The van then drove southbound on Montrose until it was pulled over by a police Tahoe at Magnolia and Montrose. Patterson retrieved a .32 caliber revolver from under the parked car and sold it two days later.

¶ 26        Rogers also alleged that he received ineffective assistance of appellate counsel. Specifically, Rogers alleged the trial court violated his right to present a defense and to confront

witnesses against him when it excluded evidence of Green and Wilson's gang history. He also alleged that appellate counsel was ineffective for failing to raise this issue on direct appeal.

¶ 27    On February 26, 2018, the trial court summarily dismissed the petition as frivolous and patently without merit in a written order.

¶ 28     This timely appeal followed.

¶ 29                                    ANALYSIS

¶ 30    On appeal, Rogers argues the trial court erred in summarily dismissing the *pro se* post-conviction petition. Specifically, he contends he (1) raised an arguable actual innocence claim that he acted in self-defense, and (2) presented an arguable claim that appellate counsel was ineffective.

¶ 31    The Post-Conviction Hearing Act ("Act") (725 ILCS 5/122-1, *et seq.* (2016) provides a method by which criminal defendants can assert claims for substantial violations of their federal or state constitutional rights. *People v. Tate*, 2012 IL 112214, ¶ 8.  A proceeding under the Act is not a substitute for an appeal, but rather, is a collateral attack on a final judgment. *People v. Edwards*, 2012 IL 111711, ¶ 21. All issues decided on direct appeal are *res judicata*, and all issues that could have been raised are forfeited. *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007).

¶ 32    In cases not involving the death penalty, a post-conviction proceeding contains three stages. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the trial court must independently review the post-conviction petition and determine whether "the petition is frivolous or is patently without merit." *Id.* The petitioner need only allege the gist of a constitutional violation. *Id.* "If the court determines that the petition is either frivolous or

patently without merit, the court must dismiss the petition in a written order." *Id*. In evaluating a claim, the court examines both the petition's allegations and any accompanying documentation. *People v. Domagala*, 2013 IL 113688, ¶ 33. At the first stage, "all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). A dismissal at the first stage of the post-conviction petition is reviewed *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 33    Rogers claims that evidence of a gun being discarded from the van arguably supports his actual innocence claim that he acted in self-defense. To succeed on a claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and not merely cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 34    The State disputes that Patterson's observation was newly discovered. To be newly discovered, evidence must be discovered after trial and the petitioner could not have discovered it earlier through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. The State argues that because Patterson and Rogers belonged to the same gang, Rogers could have discovered the evidence earlier had he exercised due diligence. We disagree.

¶ 35    Due diligence does not require a defendant to become clairvoyant. After the shooting, Rogers ran to McDaniel's apartment on Malden Street. Hudson drove the van down Magnolia Avenue, which was two blocks away. Rogers could not have known that a fellow gang member just happened to be standing on Magnolia at the exact time and directly across the street from where the van discarded the gun. How could he know that? Perhaps the State believes the gang had weekly meetings where members would report everything they witnessed and members

11

not in attendance would receive minutes. Or perhaps the gang had a bulletin board or group text to regularly update other members on unusual sightings. We doubt any of this occurred. Even if due diligence meant that Rogers was required to ask every member of his gang whether anyone knew anything about the shooting or a blue van on January 4, 2011, it would be up to another member to come forward with such information. In his affidavit, Patterson stated that he did not inform Rogers what he witnessed until 2017. Although Patterson stated that he "showed Marco the gun," there is no evidence that Rogers knew Marco had this evidence pre-trial. Instead, Rogers stated in his affidavit that he learned Marco was in the vicinity of the shooting from Patterson in 2017. Taken as true and liberally construed in Rogers' favor, Patterson's account qualifies as newly discovered evidence.

¶ 36    Rogers then argues that Patterson's affidavit is at least material and noncumulative to his claim of self-defense. Material evidence is relevant and probative of the petitioner's innocence. *Coleman*, 2013 IL 113307, ¶ 96. Noncumulative evidence adds to the information that the trier of fact heard at trial. *Id*. Rogers contends that Patterson observing a gun being discarded from the van is relevant to show that he acted reasonably when he shot at the van. We note that the State does not argue the evidence is cumulative. It clearly is not. Evidence that a gun was inside the car was not before the jury.

¶ 37    The issue is whether the evidence is material to Rogers' self-defense claim. Accepting Patterson's allegation as true, the gun was inside the van at some point, but it is unclear when. It is possible that Hudson was carrying the gun and discarded it after the shooting when he drove away. Patterson attested that he saw the gun discarded from the driver's side. In this scenario, the presence of the gun would be irrelevant to Rogers' claim since he did not fire at

Hudson. Further, at the time of the shooting, Rogers did not know Hudson had any connection to the van. The relevant inquiry for Rogers' self-defense claim is his state of mind in the moment. When Rogers shot at Green, he believed that he was shooting at a stranger unconnected to Hudson. He cannot argue in hindsight that firing at Green was in self-defense because Hudson may have been armed. However, if the gun was inside the van the entire time, then evidence of it being discarded would be relevant. Rogers testified that he believed Green reached down or pointed at him, then opened the car door. Since it is possible that the gun was inside the van when Rogers began shooting, we conclude that Patterson's account was at least arguably material and noncumulative.

¶ 38    Finally, Rogers argues that the new evidence is arguably of such a conclusive character that it would probably change the result on retrial. The conclusive-character element requires that the new evidence place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt. *People v. Robinson,* 2020 IL 123849, ¶ 56. However, "[t]he new evidence need not be entirely dispositive to be likely to alter the result on retrial." ¶ 48. Our supreme court has noted that the conclusiveness of the new evidence is the most important element of an actual innocence claim. *People v. Sanders*, 2016 IL 118123, ¶ 47.

¶ 39    To establish the affirmative defense of self-defense, a defendant is required to show "(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004). Since Rogers did not know that Hudson

had any connection to the van, his self-defense claim must be analyzed solely through his encounter with Green.

¶ 40    The entirety of Green's actions against Rogers consisted of reaching down or pointing, then opening the van door. Even assuming that the gun was inside the van, there is still insufficient evidence to support Rogers' claim of self-defense. Green's pointing, while possibly rude, was not unlawful. Green was also not the aggressor. On the contrary, at trial, Rogers admitted that he "wasn't going to stand there and wait and see" what was in Green's hands before he decided to start shooting. This clearly indicates that Rogers was the aggressor in this encounter.

¶ 41    Next, there was no imminent danger of harm. Rogers believed that Green was about to shoot, but this belief could not have been based on any of Green's actions. Rogers did not know whether Green had a gun in the van and admitted that he did not see one. According to Rogers, the last thing Green did before he shot him was to open the car door. Without seeing a gun or hearing a threat, attempting to exit the van, assuming that is what Green was doing, did not create any imminent danger of harm. Next, there is no indication that Rogers' use of force was necessary. Again, pointing and opening a car door does not require deadly force, especially without the presence of a gun or any other threat. While Rogers may have actually and subjectively believed a danger existed that required the use of the force applied, his belief was not objectively reasonable. Most individuals would not believe that someone was about to shoot simply after pointing and opening their car door. Rogers seems to argue that because he is a gang member, who has a dangerous life, he deserves an exception regarding self-defense. We disagree. We acknowledge that selling drugs in a dangerous neighborhood and being shot

14

at multiple times, including being hit once, may cause an individual to become paranoid, but that does not give that individual the right to have extreme reactions to non-threatening behavior.

¶ 42        Because Patterson's affidavit does not support Roger's claim of self defense, it is not of such a conclusive character that it would probably change the result on retrial. Therefore, Rogers failed to establish an actual innocence claim.

¶ 43        Rogers also argues that he presented an arguable claim that appellate counsel was ineffective. Rogers maintains that counsel should have argued on direct appeal that the trial court erred in preventing Rogers from introducing evidence of witnesses' gang involvement to support his defense.

¶ 44        A criminal defendant has the right to the effective assistance of counsel under both the United States and Illinois constitutions. *Strickland v. Washington*, 466 U.S.668, 690-91 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). In determining whether a defendant was denied effective assistance of appellate counsel, this court applies the familiar two-prong test set forth in Strickland. *People v. English*, 2013 IL 112890, ¶ 33. A defendant must demonstrate (1) that counsel's representation was deficient, and (2) that the deficient performance prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36. In the context of a first stage proceeding, a defendant need only show that it is arguable that counsel's representation was deficient, and it is arguable that the outcome of his case would have been different absent the deficient representation. *Hodges*, 234 Ill. 2d at 17.

¶ 45        In this case, the trial court excluded evidence that Hudson, Wilson, and Thompson were members of a rival gang. Rogers argues that he was denied his right to present a complete

defense because of this exclusion. Specifically, he contends that evidence of their gang affiliation would have strengthened his defense that he was, at most, guilty of second-degree murder. We disagree.

¶ 46    Second degree murder is a lesser-mitigated offense of first-degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. One commits second degree murder if, at the time of the killing, he acted under an unreasonable belief that the use of deadly force was justified. 720 ILLS 5/9-2(a)(2) (West 2010). According to Rogers, he heard Hudson identify him as a member of the Black P Stone gang. At that time, there was conflict between the Black P Stone gang and the Vice Lord gang. Rogers had been shot at multiple times, including the July 29, 2010 incident where he was shot, and a friend was killed. Rogers was also aware of other gang related shootings in the area. Being identified as a gang member was dangerous. Despite this, Rogers retreated from Hudson instead of defending himself. When he retreated, he did not know Hudson had any connection to the van, where he sought safety. While at the van, Rogers saw the driver, a stranger whom he did not recognize as a gang member, reach down or point, and then open the door. He did not know anyone else was in the van but decided to shoot first to prevent the driver from shooting at him. This evidence simply does not support the offense of second-degree murder.

¶ 47    The crucial inquiry for the trier of fact to consider is Rogers' state of mind at the time of the killing. When he shot at the van, Rogers was not defending himself from Hudson. Instead, he shot in response to what he believed was a second, independent threat from Green. Therefore, Hudson's gang affiliation is irrelevant as it was not the basis for Rogers' use of force. He cannot link the two encounters simply because he now knows the two men were

connected. Moreover, Rogers did not know that Wilson and Thompson were inside the van. Even if they were gang members, their gang affiliation would also be irrelevant as it was not the basis for Rogers' use of force. Rogers could not have been defending himself from the danger posed by rival gang members if he did not know these rivals were even present. At trial, Rogers admitted that he did not know whether anyone else was in the van with Green. He now claims that their gang affiliation led him to believe deadly force was necessary. This is a nonsensical argument.

¶ 48        "Appellate counsel is not required to raise issues that he reasonably determines are not meritorious." *People v. English*, 2013 IL 112890, ¶ 33. Here, it was reasonable for appellate counsel to conclude that raising the issue of gang membership would not succeed. Rogers shot and killed Green as he sat in the driver's seat of a van. At the time of the killing, Green was a stranger to Rogers and had no obvious gang affiliation. While Rogers believed Hudson resembled the man who shot him, because he did not realize Green was connected to Hudson, Green's killing cannot be regarded as an act of self defense against Hudson. Rogers also did not realize that there were other passengers in the van; he thought Green was alone. He now claims that the gang affiliations of other passengers, whom he was unaware of at the time, were the real reason for the shooting. This is a clear attempt to justify murder with hindsight.

¶ 49        We conclude that appellate counsel was not deficient for failing to allege that the trial court deprived Rogers of his right to present a defense by excluding gang evidence. This argument was meritless. As such, Rogers has suffered no prejudice from counsel's failure to raise the issue on appeal. *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Therefore, the trial court did not err in summarily dismissing Rogers' postconviction petition.

¶ 50                                    CONCLUSION

¶ 51            For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 52            Affirmed.